**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CHRISTINE M. SPURLING-DICK,

        **Plaintiff,**

v.
                                     Civil Action No. 1:08CV106
                                     (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. Procedural History

Christine M. Spurling-Dick ("Plaintiff") filed an application for SSI and DIB on March 15, 2005, alleging disability since January 1, 2005, due to neuropathy, congestive heart failure, diabetes, anxiety, depression, hypertension, and deafness in her right ear (R. 47, 48-50). The state agency denied Plaintiff's application initially and on reconsideration (R. 36, 37). Plaintiff requested a hearing, which Administrative Law Judge R. Neely Owen ("ALJ") held, via video with Plaintiff appearing in Morgantown, West Virginia, and the ALJ sitting in Charlottesville, Virginia, on July 2,

2007, and at which Plaintiff, aided by a non-attorney representative, Jennifer LaRosa, and Dr. Barry

Hensley, a vocational expert ("VE"), testified (R. 12, 371-97). On August 31, 2007, the ALJ entered

a decision finding Plaintiff was not disabled and that she could perform her past work as a waitress,

cook, and telemarketer (R. 25, 12-25). On September 17, 2007, Plaintiff filed a Request for Review

of Hearing Decision to the Appeals Council (R. 8). On February 15, 2008, the Appeals Council

denied Plaintiff's request for review, making the ALJ's decision the final decision of the

Commissioner (R. 5-7).

## II. Statement of Facts[1]

Plaintiff was thirty-eight years old at the time of the ALJ's decision (R. 47). Plaintiff attained

a high school diploma, and she completed some college courses. Her past relevant work included that

of a waitress, cook, and telemarketer (R. 376, 395).

On July 11, 1988, Plaintiff underwent an audiological evaluation, which showed "moderately

severe mixed type hearing loss with excellent speech discrim." in the right ear and "slight s-m hearing

---

[1]In Plaintiff's argument, she asserts the ALJ erred in not including limitations in his RFC for impairments he found to be severe; specifically, bilateral carpal tunnel syndrome, hearing loss, headaches, and diabetic neuropathy (R. 5-7). In her recitation of the facts in her Brief in Support of Plaintiff's Motion for Summary Judgment, Plaintiff does not include all evidence of record but points to very limited examples of objective medical and opinion evidence; specifically, she lists the medication she takes for diabetes, the results of a January 19, 2005, EMG, the results of a January 13, 2005, lumbar spine MRI, the pain medications she takes, the cause of her hearing loss, the results of a 2007 audiological evaluation, and the cause of her headaches (R. 3). Defendant, in his Brief in Support of His Motion for Summary Judgment, incorporates only the evidence of record relative to those severe impairments for which Plaintiff alleges the ALJ did not include any significant limitations in the RFC. Defendant includes facts about Plaintiff's carpal tunnel syndrome, hearing loss, headaches, and diabetic neuropathy, along with evidence from a state agency physician, the VE's testimony, and the ALJ's decision. Based on Plaintiff's argument and Defendant's response thereto, as found in his Brief, the undersigned will only include those portions of the evidence of record that are relevant to Plaintiff's bilateral carpal tunnel syndrome, hearing loss, headaches, and diabetic neuropathy.

loss above 1kHz. Excellent speech discrim"(R. 339).

On August 8, 1988, Plaintiff underwent a right tympanomastoidectomy[2], which was performed by T. F. Hall, M.D., as treatment for chronic draining of her right ear, which had lasted for approximately five months. Postoperatively, Dr. Hall found the following:

1. Acute and chronic inflammatory disease of the middle ear and mastoid cavity, no evidence of cholesteatoma.

2. Erosion of the long process of the incus[3], but a bony union was present between the lenticular knob and the capitulum.

3. Extensive middle ear muscosal[4] disease.

4. Inferiorly positioned tympanic membrane perforation.

5. Active purulent material seen in the middle ear and mastoid area (R. 336).

On December 20, 2004, Plaintiff was examined by Mohamad Arja, M.D., who opined Plaintiff was positive for sensation changes and left leg numbness. He diagnosed back pain, left leg radiculopathy, and leg edema. He prescribed Levaquin (R. 185).

On January 11, 2005, Plaintiff was examined by Dr. Arja, who found sensation changes,

---

[2]Tympanomastoidectomy: mastoidectomy with tympanectomy. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1976.
    Mastoidectomy: excision of the mastoid air cells or the mastoid process. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1104.
    Tympanectomy: excision of the tympanic membrane. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1976.

[3]Incus: the middle of the three ossicles of the ear, which, with the stapes and malleus, serves to conduct vibrations from the tympanic membrane to the inner ear. Called also anvil. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 923.

[4]Muscosal: pertaining to the tunica muscosa. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1180.

musculoskeletal joint pain, and left leg numbness (R. 184).

On January 13, 2005, Plaintiff had a MRI of her lumbar spine made. It showed a small disc protrusion at L5-S1 with no spinal stenosis. There was mild left neural foraminal encroachment but no direct compression of the nerve root (R. 270, 271).

On January 19, 2005, Plaintiff underwent an electromyographic test. Dr. Azzouz noted the results were "suggestive of peripheral neuropathy with superimposed bilateral carpal tunnel syndrome that is worse on the right" (R. 193, 329).

On January 26, 2005, Plaintiff was examined by Dr. Arja. Plaintiff's systems were normal. Plaintiff stated she experienced low back pain and swelling in her extremities. She was diagnosed with disc protrusion and bilateral carpal tunnel syndrome. He prescribed Tylenol and Elavil (R. 183).

On February 7, 2005, Dr. David McLellan completed a Doppler waveform analysis of Plaintiff. Pulses were normal in both legs. There was no evidence of resting ischemia bilaterally (R. 266).

On February 15, 2005, Dr. Arja examined Plaintiff and found sensation changes, trace ankle edema, and musculoskeletal joint pain. She was diagnosed with neuropathy (R. 182).

On April 12, 2005, Plaintiff was examined by Dr. Arja, who diagnosed trace ankle edema; her neurological system was intact. Plaintiff did not display focal weakness or sensation changes (R. 181).

On May 17, 2005, Dr. Arja examined Plaintiff and noted she was positive for musculoskeletal joint pain; all other systems were normal. Plaintiff's was neurologically intact in that she demonstrated no focal weakness or sensation changes (R. 180).

On May 25, 2005, Plaintiff was examined by Dr. Arja; except for her gastrointestinal system, all her systems were normal. She was neurologically intact in that she displayed no focal weakness or sensation changes (R. 179).

On June 21, 2005, Plaintiff injured her head in an automobile accident. She presented to the Emergency Department at Fairmont General Hospital with complaints of neck and back pain, scalp laceration, and headache (R. 148). The emergency room doctor noted Plaintiff was sleepy; she had neuropathy in her arms and legs (R. 150). Plaintiff's lumbar spine, cervical spine, thoracic spine, and chest x-rays were negative (R. 154, 155, 156, 157). Plaintiff CT scan of her cervical spine and her head were normal (R.158, 159). She was treated with Toradol and Lortab and released (R. 149,150).

On June 23, 2005, Dr. Arja examined Plaintiff. Her systems were normal. She had no neurological focal weakness or sensation changes (R. 178).

On June 25, 2005, Plaintiff returned to Fairmont General Hospital for a follow-up examination to her automobile accident (R. 163). Plaintiff reported she was "seeing double" (R. 165). It was noted that Plaintiff's headache continued on the right (R. 163).

Plaintiff's June 17, 2005, laboratory test showed Plaintiff's glucose level was elevated (R. 278). Also on June 25, 2005, Plaintiff's blood lab work was normal (R. 169-70).

On June 28, 2005, Dr. Yepes noted Plaintiff had been in an automobile accident and had sustained a rib fracture, dislocated disc, and muscle soreness (R. 296).

On July 5, 2005, Plaintiff informed Dr. Arja she had rib pain and her scalp was infected at the laceration site. Upon examination Dr. Arja found Plaintiff' systems were normal (R. 177).

On July 29, 2005, Plaintiff presented to Dr. Arja with complaints of being "stressed out over situation [with her] children (being taken away)." Plaintiff had no new complaints. Except for musculoskeletal joint pain, Plaintiff's examination results of all her systems were normal. Plaintiff was diagnosed with paronychia of her right fourth finger and prescribed Avelox (R. 176).

Plaintiff's September 3, 2005, laboratory test showed elevated glucose (R. 274).

On October 5, 2005, Mouhannad Azzouz, M.D., a neurologist, examined Plaintiff, upon referral from Dr. Arja, for her complaints of headaches. Plaintiff informed Dr. Azzouz that since the June 21, 2005, automobile accident, she had been experiencing "significant right sided headaches with no significant nausea or vomiting or migrainous features." Dr. Azzouz reviewed a MRI of Plaintiff's brain, which was made "several weeks ago," and found "increased signal in the right frontal lobe in the white matter deeply, otherwise, no major abnormality [was] seen. The spot it [sic] small and it is probably of nonspecific etiology" (R. 189, 191-92).

Upon examination, Dr. Azzouz found Plaintiff's cranial nerves were intact; she had no skull deformities or tenderness; there was no focal motor deficit; her sensory examination was consistent with peripheral neuropathy; her reflexes were diminished in her lower extremities; her gait was intact. Dr. Azzouz found Plaintiff's headaches were "exacerbated following her motor vehicle accident and more likely there seemed to be a musculoskeletal component since it seem[ed] to correlate with the site of her injury." Dr. Azzouz found "post concussion headaches tend to last sometimes several months"; he suggested Plaintiff "maintain herself on Elavil and to be increased as tolerated" (R. 189). Dr. Azzouz instructed Plaintiff to return to his care in two-to-three months (R. 190).

On October 13, 2005, Kip Beard, M.D., completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were for diabetes, congestive heart failure, neuropathy and hypertension. Dr. Beard acknowledged Plaintiff's EMG nerve conduction study; Plaintiff informed him she experienced burning in her arms, hands, legs, and feet. Plaintiff stated she experienced numbness (R.195). Plaintiff reported she experienced right-sided headaches since her 2005 motor vehicle accident. Plaintiff described her headaches as feeling "'like [her] head [was] going to fall off.'" She stated the headaches occurred and lasted for a "couple hours at a time." Plaintiff informed Dr. Beard that she had undergone a CT scan and a MRI for her headaches, as ordered by Dr. Azzouz,

but "was not told of any abnormal findings on there." Plaintiff also informed Dr. Beard that she had undergone right ear surgery in 1986 for mastoiditis. She reported she had "problems with hearing out of her right hear"; "she [could] only hear faintly out of the right ear"; and she could not hear on the phone. Plaintiff stated she had intermittent tinnitus[5] and had had no subsequent ear surgery (R. 196).

Plaintiff listed her medications as Hyzaar, Neurontin, Elavil, Flexeril, Vytorin, Lisinopril, Coreg, Darvocet, Motrin, Seroquel, Xanax, Effexor, Diamox (R. 196).

Upon examination, Dr. Beard observed Plaintiff was wearing a right-wrist splint and bilateral knee braces. Dr. Beard noted Plaintiff ambulated with a slow-paced gait and a mild left limp. Plaintiff was able to stand unassisted; she had no difficulty arising from a seated position; she had no difficulty climbing up and down from the examination table. Dr. Beard noted Plaintiff could speak understandably and follow instructions without difficulty (R. 197). Dr. Beard's examinations of Plaintiff's HEENT, neck, chest, cardiovascular, abdomen, extremities, cervical spine, arms, and ankles/feet produced normal results (R. 197-98).

Dr. Beard's examination of Plaintiff's hands revealed no tenderness, redness, warmth or swelling. There was no atrophy; Plaintiff could make a fist bilaterally. No Heberden or Bouchard nodes were present. Plaintiff's grip strength was 20 KG of force on the right and 28 KG of force on the left. Plaintiff was able to button and pick up coins with either hand and to write with her right (dominant) hand without difficulty (R. 198). Dr. Beard's range of motion examination of Plaintiff's wrist showed both hands could be fully extended and the fingers could be opposed. Plaintiff's fine manipulation was normal (R. 201). Dr. Beard's examination of Plaintiff's knees revealed "complaints

_____

[5]Tinnitus: a noise in the ears, such as ringing, buzzing, roaring, or clicking. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1914.

of pain on motion testing with tenderness, some patellofemoral crepitation, but no redness, warmth, swelling, effusion, or laxity was observed (R.198). Dr. Beard's examination of Plaintiff's lumbosacral spine/hips revealed pain on motion testing and tenderness with normal curvature. Plaintiff had no spasm. She could stand on one leg at a time without difficulty. Plaintiff's straight-leg raising test "was normal to 90 degrees bilaterally in the supine and sitting positions without complaints." Plaintiff had no tenderness on palpation at her hips. Dr. Beard's neurologic examination of Plaintiff revealed "some diminished sensation in the stocking and glove distribution in the arms and legs." No focal weakness or atrophy were observed. Plaintiff's deep tendon reflexes were "2+ biceps and patellar [and] 1+ triceps and Achilles." Plaintiff could walk on heels and toes and could walk heel to toe. Plaintiff could squat, but she complained of knee pain (R. 199).

Dr. Beard's impression was as follows: diabetes mellitus, type II, with "possible diabetic neuropathy"; shortness of breath; hypertension; urinary incontinence; headaches; lower back pain with history of lumbosacral strain; and bilateral knee pain with evidence of patellofemoral chondromalacia or osteoarthritis. Dr. Beard reiterated his finding that his "examination reveal[ed] some subjective sensory loss in a stocking and glove distribution that may represent neuropathy. The claimant's gait was not neuropathic, and manipulation was well preserved. Dr. Beard noted his examination of Plaintiff's knees revealed "some pain with motion testing, tenderness and patellofemoral crepitation with mild motion loss." He found Plaintiff "did not appear to have difficulty hearing normal conversational volume." Her "neurologic exam [was] unremarkable" as to her headaches (R. 200).

On November 4, 2005, Cynthia Osborne, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total

of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 212). Dr. Osborne found Plaintiff could never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl (R. 213). Dr. Osborne found Plaintiff had no manipulative, visual, or hearing limitations (R. 214-15). Dr. Osborne found Plaintiff's environmental limitations were unlimited as to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. Dr. Osborne found Plaintiff should avoid concentrated exposure to hazards (R. 215). Dr. Osborne found Plaintiff was "morbidly obese with [complaints of] back and knee pain as well as h/o DM. Except for obesity PE is unremarkable. [Complaints of] pain with movement but normal ROM except for cervical spine. [Complaints of] lower extremity pain with possible neuropathy. No ADL's were returned so unable to adequately assess credibility. Decrease RFC to light with limitations as indicated" (R. 216). In making her assessment of Plaintiff, Dr. Osborne relied on the October 13, 2005, examination of Plaintiff by Dr. Beard, who found a negative straight leg-raising test, possible diabetic neuropathy, bilateral knee pain with evidence of patellofemoral chonromalacia or osteoarthritis, and range of motion within normal limits (except for reduced cervical spine extension to sixty degrees). Dr. Osborne also considered a January 1, 2005, record where Plaintiff stated her medical conditions included "neuropathy, CHF, diabetic, anxiety, depression, hypertension, and deaf" in right ear. Dr. Osborne noted Plaintiff's Doppler waveform analysis showed no evidence of resting ischemia in either leg and her lumbar spine MRI showed a small disc protrusion at L5-S1, with no spinal stenosis and no direct compression of the nerve root but mild left neural foraminal encroachment (R. 218).

On November 4, 2005, Plaintiff presented to Dr. Arja with complaints of not sleeping well and feeling depressed. He found her extremities were positive for swelling and pain and her

musculoskeletal system positive for joint pain (R. 262).

On November 15, 2005, Dr. Arja found, upon examination, that Plaintiff had no focal weakness or sensation changes and no musculoskeletal joint pain. She was positive for extremity swelling (R. 261).

Plaintiff's December 2, 2005, blood lab work showed elevated glucose levels(R. 160-61).

Plaintiff's extremities were swollen and she had trace ankle edema on January 10, 2006, when examined by Dr. Arja (R. 260).

On the 31st of January, 2006, Dr. Arja's examination of Plaintiff revealed no focal weakness or sensation loss, no extremity swelling, and no musculoskeletal joint pain (R. 259).

On February 23, 2006, Plaintiff was treated by Dr. Arja for sinusitis. He found Plaintiff had no focal weakness or sensation loss, no extremity swelling, and no musculoskeletal joint pain (R. 258).

In an undated letter, addressed "To whom it may concern," Melissa Basnett, PA-C for Dr. Arja, wrote that Plaintiff experienced "multiple" medical problems, including hypertension, type II diabetes mellitus, depression, congestive heart failure, hypertensive cardiovascular disease, anxiety, peripheral neuropathy, mild mitral regurgitation, and mild aortic insufficiency. P.A. Basnett wrote Plaintiff complained of chronic back pain and that her lumbar MRI showed disc protrusion at L5-S1 with mild left neuroforaminal encroachment. P.A. Basnett opined all of Plaintiff's "problems [were] chronic" and "[s]ome of these problems [were] disabling." P. A. Basnett wrote the following: "Considering all of her current medical problems, and the nature of her home situation, I feel that it would be a detriment to her overall condition for her to be employed outside of her home"(R. 256).

On May 22, 2006, Porfirio Pascasio, a state-agency physician, reviewed and affirmed the November 4, 2005, Physical Residual Functional Assessment completed by Dr. Osborne (R. 286).

On June 14, 2007, Plaintiff's laboratory tests revealed normal glucose levels (R. 324).

On September 21, 2007, Plaintiff was examined by Dr. Azzouz for "problems" with her hands, especially her right hand (R. 326). Dr. Azzouz diagnosed diabetes mellitus, bilateral carpal tunnel syndrome and osteoarthritis. He referred Plaintiff to Dr. Thrush (R. 327).

Evidence Received Subsequent to the Hearing

On July 6, 2006, Plaintiff presented to Dr. Arja with complaints of increased nosebleeds, fatigue and tiredness. She was positive for musculoskeletal joint pain. Dr. Arja diagnosed rhinitis, sinusitis, fatigue and joint and muscle pain. He prescribed Claritin and Augmentin (R. 356).

On September 5 and 7, 2006, Dr. Arja found Plaintiff was not positive for musculoskeletal joint pain, focal weakness, sensation changes, or extremity swelling (R. 354, 355).

On March 28, 2007, Dr. Arja found Plaintiff was positive for musculoskeletal joint pain. She did not have extremity swelling, focal weakness, or sensation changes (R. 352).

On June 11, 2007, Dr. Arja, upon examination, found Plaintiff had no musculoskeletal joint pain, swollen extremities, focal weakness, or sensation changes. Plaintiff reported no "new problem[s]" (R. 351).

On June 19, 2007, Plaintiff underwent an audiological evaluation. Plaintiff's response consistency was "good." Plaintiff was diagnosed with "[m]oderate to severe mixed type [hearing loss]. Reduced [speech discrimination]" of her right ear and "[m]ild . . . [hearing loss]. Excellent [speech discrimination]"of her left ear (R. 350).

Administrative Hearing

At the administrative hearing, held on July 2, 2007, Plaintiff testified, when questioned by her non-attorney representative, that her blood sugar dropped below normal once or twice monthly and

that her normal blood-sugar range was eighty-nine to one-hundred and twenty-five. Plaintiff stated she had been diagnosed with diabetic neuropathy, which caused constant, daily pain in her back and legs (R. 381). Plaintiff testified her back and leg pain was at six on a scale of one-to-ten, but elevated twice daily to a level ten. Plaintiff stated she treated her back and leg pain with Neurontin, Ibuprofen, and Darvocet, which helped ease her pain and that she experienced no adverse side effects of that medication (R. 382-83). Plaintiff stated she could stand for fifteen to twenty minutes and cold walk for five to fifteen minutes at a time. Plaintiff testified she could sit for approximately thirty minutes at a time. Plaintiff stated she lay down for two-to-five hours daily due to back and leg pain. Plaintiff stated she could lift a gallon of milk (R. 383).

Plaintiff testified she had carpal tunnel syndrome in both hands (R. 385). Plaintiff stated she experienced numbness in her hands at all times; she had no feeling in her hands. Plaintiff stated she had no strength in her right hand. She testified she could not pick up anything because she dropped it. Plaintiff stated she could not zip her pants (R. 386).

Plaintiff testified she constantly had headaches (R. 386). Plaintiff stated her headaches became worse in the evening. Plaintiff stated she treated her headaches with cold compresses; she did not believe she had been prescribed any specific medication for treatment of headache( R. 387).

Plaintiff testified she was totally deaf in her right ear (R. 387). Plaintiff stated she had a ten to fifteen percent hearing loss in her left ear, which was being treated by a physician. Plaintiff stated she could not listen through headsets or headphones due to her hearing loss. Plaintiff testified she could hear normal conversations "sometimes." Plaintiff stated she had difficulty hearing if there was background noise because she experienced a constant "roaring in [her] left ear" (R. 388).

Plaintiff testified she cooked simple meals; cleaned when she "fe[lt] like it," but usually once

per week; and read occasionally (R. 391-92).

The ALJ asked the VE the following hypothetical question:

ALJ:    . . . Looking at the baseline information I show an individual born on November the 19th, 1968. There is an alleged onset of January 1 of '05. She was 36 at that time, currently 38 years of age. She has a high school plus in her education. . . . There's no other vocation training other than what she may have required [sic] on the job (R. 394). Can you identify the past work history of this lady had on a vocation level or nature . . .? (R. 395).

VE:    Yes, sir. She's worked as a home attendant. As she performed that job, from her testimony today, that's heavy and unskilled, SVP of one to two. She's also worked as a waitress and a cook, SVP one to two. It's unskilled and light. And she's also worked in telemarketing. That is also unskilled with a SVP of one dash two and it's sedentary (R. 395).

ALJ:    I'd like for you to consider for the purposes of a hypothetical. We have an individual of the same age, educational background and vocational history as this claimant. And such a person would retain the past work as indicted in Exhibit 14F and . . . (R. 395).

VE:    Light (R. 395).

ALJ:    Would it allow for any of the past work which you have referred to to be performed?( R. 395).

VE:    Yes, sir. It would allow for the waitress and the cook and prevent telemarketing (R. 395-96).

ALJ:    I'd like for you to consider for the purpose of the second hypothetical that . . . . It seems to me the effect on her discomfort, her peripheral neuropathy, difficulty with the carpal tunnel syndrome effectively reducing her bilateral use of her appendages in the levels which she's indicated, making mental activity difficult and she would have to take frequent rest periods or breaks at unscheduled times and for unpredictable periods and that she would have difficulty with her hearing as indicated and headaches also that would also, further interfere with her availability in the workplace at the frequency and duration . . . . All of those things in combination would prevent her from doing not only the work you've indicated but all other work. Would you agree? (R. 396).

VE:    I would, sir (R. 396).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Owen made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2009 (R. 14).

2.  The claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*) (R. 14).

3.  The claimant has the following severe impairments: idiopathic cardiomyopathy, bilateral carpal tunnel syndrome, diabetes, diabetic neuropathy, hypertension, obesity, headaches, moderately severe hearing loss right ear, slight hearing loss left ear, and disc protrusion at L5/S1 (20 CFR 404.1520(c) and 416.920(c) (R. 14).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 18).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except for performing only occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, and no work around hazards (R. 19).

6.  The claimant is capable of performing past relevant work as a waitress, cook and telemarketer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965) (R. 25).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.1920(f)) (R. 25).

### IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

14

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.    The ALJ's decision must be reversed because the ALJ failed to include in his residual functional capacity assessment the limitations caused by several of the severe impairments that he found to be supported by the evidence.

The Commissioner contends:

1.    The ALJ's residual functional capacity assessment accounted for all of Plaintiff's functional limitations that were supported by the objective medical evidence.

### C. Severe Impairments

Plaintiff contends the ALJ erred in his RFC in that he failed to include limitations caused by several of the severe impairments that the ALJ found to be supported by the evidence. Defendant

contends the ALJ's RFC assessment accounted for all of Plaintiff's functional limitations that were supported by the objective medical evidence.

In his decision, the ALJ found the following as to Plaintiff's severe impairments: "The claimant has the following severe impairments: idiopathic cardiomyopathy, bilateral carpal tunnel syndrome, diabetes, diabetic neuropathy, hypertension, obesity, headaches, moderately severe hearing loss right ear, slight hearing loss left ear, and disc protrusion at L5/S1 . . ."(R. 14).

20 C.F.R. §§ 404.1521(b) and 416.921(b) hold the following:

> . . . To be "severe," an impairment must *significantly* limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c). (Emphasis added.) "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

Plaintiff asserts the following: "[T]here are multiple severe impairments, and thus significant limitations, that are not addressed by the RFC assessment. . . . First, there are no limitations from the impairment of bilateral carpal tunnel syndrome included in the RFC determination. . . . Despite finding that [Plaintiff's] hearing loss to be severe and causing significant work-related limitations and discussing the objective medical findings in his decision, the ALJ failed to include any restriction in his RFC assessment to account for [Plaintiff's] significant hearing loss. . . . Despite finding that [Plaintiff's] headaches to be severe and causing significant work-related limitations and discussing the medical findings in his decision, the ALJ failed to include any restriction in his RFC assessment to account for [Plaintiff's] headaches. . . . Despite finding the diabetic neuropathy to be severe and noting the objective medical evidence, the ALJ found [Plaintiff] capable of being on her

feet six out of eight hours of the work day without so much as even a sit/stand option" (Plaintiff's brief at pp. 5-7).

20 C.F.R. §§ 404.1545 and 416.945 provide the following:

A residual functional capacity is what a claimant can still do despite his or her limitations. Residual functional capacity is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons as to claimant's limitations may be used. These descriptions and observations must be considered along with medical records to assist the Commissioner in deciding to what extent an impairment keeps a claimant from performing particular work activities. This assessment is not a decision on whether a claimant is disabled but is used as the basis for determining the particular types of work a claimant may be able to do despite his or her impairments. In assessing physical abilities, the Commissioner first evaluates the nature and extent of a claimant's physical limitations and then determines the RFC for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) may reduce a claimant's ability to do either past work or other work. When a claimant has a severe impairment that does not meet a listing, the Commissioner will consider the limiting effects of all the impairments in determining his or her residual functional capacity.

The ALJ found that Plaintiff retained the residual functional capacity to "perform light work except for performing only occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, and no work around hazards" (R. 19). The ALJ was required to consider the limiting effects caused by those impairments he found to be severe when determining Plaintiff's RFC, but he did not include any *significant* limitation in the RFC that were caused by Plaintiff's hearing loss, bilateral carpal tunnel syndrome, and headaches.

The ALJ considered the following evidence of record as to Plaintiff's hearing loss in his decision:

The claimant suffers from moderately severe mixed type hearing loss in the right ear.

Her hearing threshold sensitivity on the right was 50 and 10 on the left with 100 percent speech discrimination bilaterally (R. 18).

An audiological evaluation performed on July 11, 1988 demonstrated that the claimant had a moderately severe mixed type hearing loss with excellent speech discrimination of the right ear; and slight sensorineural hearing loss above 1kHz, with excellent speech discrimination. In August 1988 the claimant underwent a right mastoidectomy with tympanoplasty. The claimant was subsequently treated for inflammation, swelling and infection, but by November 1988 she had no pain or discomfort and no further treatment was required. She was not seen again for complaints of ear pain until August 1998. The claimant was treated several times for ear and sinus infections, but was a no show as many times again. She was last treated for left tympanic membrane perforation in September 2006, and was to keep her ears clean and dry. She did not show up for her follow-up appointments. No further audiometric testing was performed (Exhibit 27F) (R. 21).

Physical examination by the consultative examiner in October 2005 revealed . . . claimant did not appear to have any difficulty hearing normal conversation (R. 22).

In addition to not evaluating and considering the June, 2007, audiological report, the ALJ did not consider Plaintiff's testimony at the administrative hearing. Plaintiff testified she could not listen through headsets or headphones, she could hear normal conversations "sometimes," and she had difficulty hearing if there was background noise because she experienced a constant "roaring in [her] left ear" (R. 388).

The ALJ did not include any limitation in his RFC for Plaintiff's hearing loss even though he found it to be a severe impairment. As noted above, the ALJ relied on 1988 audiological test results in his decision; unfortunately, he failed to consider the results of Plaintiff's most recent audiological test. On June 19, 2007, Plaintiff underwent an audiological examination. The medical record was provided to the ALJ subsequent to the hearing and is contained in the record of evidence. The test report showed response consistency was "good." Plaintiff was diagnosed with "[m]oderate to severe mixed type [hearing loss]. Reduced [speech discrimination]" of her right ear and "[m]ild . . . [hearing loss]. Excellent [speech discrimination]" of her left ear (R. 350). The ALJ found

Plaintiff had "excellent speech discrimination of the right ear," as was noted in the 1988 audiological examination; however, the most recent audiological test results showed a change in Plaintiff's hearing status. This was not considered or weighed by the ALJ. A limitation to accommodate reduced speech discrimination caused by moderate to severe hearing loss was not included in the RFC.

Relative to Plaintiff's bilateral carpal tunnel syndrome, the ALJ, in his decision, considered the following evidence of record:

> Electromyography study results were suggestive of peripheral neuropathy with superimposed bilateral carpal tunnel syndrome, worse on the right (R. 18).

> During the consultative examination in October 2005, the claimant was wearing . . . a right wrist splint (R. 19).

> [I]n October 2005 [t]here was normal range of motion of the arms and hands. The claimant was able to make a fist bilaterally, and her grip strength was within normal limits bilaterally, but decreased on the right compared to the left. She was able to button, pick up coins, and write with her dominant hand (R. 22).

> Records from the claimant's neurologist in September 2006 indicate that the claimant continued to complain of symptoms of carpal tunnel syndrome, especially of her right hand (R. 22).

> The claimant had diminished sensation in . . . glove distribution in the arms( R. 22). A recent visit to Dr. Azzouz in June 2007, indicated that the claimant had the same symptoms and was wearing a brace on her right hand. . . . Dr. Azzouz again recommended the claimant be evaluated for carpal tunnel surgery (R. 22).

> The claimant wears braces for treatment of her carpal tunnel syndrome and she takes Neurontin and Elavil to treat it. . . .The claimant has had no worsening of [the] . . . condition. However, she was referred well over a year ago to seek an evaluation regarding surgery which may improve her symptoms. There is no record that she has done that (R. 23).

The evidence of record also contains statements made by Plaintiff relative to bilateral carpal tunnel syndrome. At the administrative hearing, the Plaintiff testified she experienced numbness in

her hands at all times; she had no feeling in her hands, she had no strength in her right hand, she could not pick up anything because she dropped it, and she could not zip her pants due to carpal tunnel syndrome (R. 386). Plaintiff also told Dr. Beard, in October 2005, that she experienced numbness and burning in her hands (R. 195). The undersigned finds the ALJ did not include any limitations in his RFC caused by Plaintiff's bilateral carpal tunnel syndrome even though he found that condition to be a severe impairment. The ALJ did not allow for a limitation due to Plaintiff's wearing a right hand/arm brace for treatment of carpal tunnel. The ALJ did not include any limitation in his RFC for Plaintiff's reduced grip strength and diminished sensation in her right hand.

The ALJ reviewed and considered the following evidence of record as to Plaintiff's headaches:

> The claimant was involved in a motor vehicle accident in June 2005 during which she suffered a head injury. She underwent a head CT scan which was unremarkable except for a punctuate posterior frontal scalp radio-dense foreign body. There were no depressed skill [sic] fractures (R. 22).

> The claimant underwent an evaluation by Dr. Azzouz in October 2005 for complaints of right sided headaches which she said had been present since her accident. The claimant underwent an MRI of the brain which showed an increased signal in the right frontal lobe in the white matter deeply, but no other abnormality. Dr. Azzouz noted that the spot was small and probably of non-specific etiology. . . . There were no major deformities of the skull or tenderness along the right aspect. There was no focal motor deficit. . . . Dr. Azzouz opined that the claimant's headaches had a musculoskeletal component and were likely exacerbated by her head injury (R. 22).

Additionally, the record contains Plaintiff's complaints of headaches to Dr. Beard. She stated, during the October, 2005, consultative examination, that she experienced right-sided headaches since her 2005 motor vehicle accident. Plaintiff described her headaches as feeling "'like [her] head [was] going to fall off'" (R. 196). At the administrative hearing, Plaintiff testified she constantly had headaches (R. 386). Plaintiff stated her headaches became worse in the evening.

Plaintiff stated she treated her headaches with cold compresses; she did not believe she had been prescribed any specific medication for treatment of headache (R. 387).

The ALJ found Plaintiff's headaches to be a severe impairment; however, he did not provide any significant limitation in his RFC to accommodate such a severe impairment.

The hypothetical question posed to the vocational expert by the ALJ did not include limitations that may have been caused by those impairments the ALJ found to be severe; namely, bilateral hearing loss, carpal tunnel syndrome, and headaches. The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English, supra.*

In the instant case, the ALJ asked the VE the following hypothetical question:

ALJ: . . . Looking at the baseline information I show an individual born on November the 19th, 1968. There is an alleged onset of January 1 of '05. She was 36 at that time, currently 38 years of age. She has a high school plus in her education. . . . There's no other vocation training other than what she

may have required [sic] on the job(R. 394). Can you identify the past work history of this lady had on a vocation level or nature . . .? ( R. 395).

VE:     Yes, sir. She's worked as a home attendant. As she performed that job, from her testimony today, that's heavy and unskilled, SVP of one to two. She's also worked as a waitress and a cook, SVP one to two. It's unskilled and light. And she's also worked in telemarketing. That is also unskilled with a SVP of one dash two and it's sedentary (R. 395).

ALJ:    I'd like for you to consider for the purposes of a hypothetical. We have an individual of the same age, educational background and vocational history as this claimant. And such a person would retain the past work as indicted in Exhibit 14F and . . . (R. 395).

VE:     Light (R. 395).

ALJ:    Would it allow for any of the past work which you have referred to to be performed? (R. 395).

VE:     Yes, sir. It would allow for the waitress and the cook and prevent telemarketing (R. 395-96).

The ALJ had determined that Plaintiff's impairments of hearing loss, carpal tunnel syndrome, and headaches were severe impairments, which created *significant* limitations of a person's ability to do basic work activities. The ALJ not make a finding that these conditions were non-severe impairments (See 20 C.F.R. § 404.1521), which would not have significantly limited Plaintiff's ability to do basic work activities. The Fourth Circuit has held the following:

> [A] impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (quoting *Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980) (emphasis added).

*Evans v. Heckler*, 734 F.2d 1012 (4th Cir. 1984).

The undersigned is not expressing an opinion that Plaintiff is disabled; indeed, except for the physician's assistant attending to Dr. Arja, no physician who treated Plaintiff limited her ability to

do basic work activities. Nonetheless, the ALJ found Plaintiff's hearing loss, bilateral carpal tunnel syndrome, and headaches to be severe impairments as supported by the record of evidence and did not include any significant limitations in his RFC or subsequent hypothetical question relative to those severe impairments. For the above stated reasons, the undersigned finds that substantial evidence does not support the ALJ's decision.

As to Plaintiff's diabetic neuropathy, the ALJ considered the following evidence in his decision:

> During the consultative examination in October 2005 the clamant [sic] was wearing bilateral knee braces . . . . She ambulated with a slow paced gait and a mild left limp. However, she was able to stand unassisted . . . . She exhibited some diminished sensation in the . . . legs . . . . She had some limitation of flexion and extension of her knees. However, range of motion of her hips and ankles were normal. Her lower extremity strength was normal (R. 18-19).

> She had no difficulty arising from a seated position, [sic] or getting up and down from the examination table. She was uncomfortable while lying down due to back pain, but appeared comfortable while seated. She was able to stand on one leg at a time without difficulty. Straight leg test was negative bilaterally. She had pain on motion of the knees and some patellofemoral crepitation . . . . The claimant was able to walk on her heels and toes, but complained of knee pain when squatting (R. 22).

> Records from the claimant's neurologist in September 2006 indicate that the claimant['s] . . . [s]trength was normal in the . . . lower extremities (R. 22).

> The SA medical consultants reviewed the evidence of record at reconsideration and opined that the claimant was capable of . . . sitting, standing and walking about 6 hours each during an 8-hour workday, while performing only occasional balancing, stooping, kneeling, crouching, crawling, climbing ramps and stairs, and no climbing of ladders, ropes or scaffolds, and no work around hazards (Exhibit 14F) (R. 23-24).

> The claimant is able to walk, albeit, sometimes slowly, but without assistance. She has no loss of motor strength . . . and her coordination . . . is normal despite neuropathy. The claimant has not been referred for any specialized treatment for her back pan [sic]. Darovcet is the strongest thing she takes for pain. . . . The SA medical assessment is detailed and based on the entire record at the time of reconsideration. There are numerous examinations and tests in the record that support the SA's medical opinion, including but not limited to . . . the ability to sit,

stand and move around without overt difficulty; good range of motion in all extremities except for the lumbar spine and knees; no swelling or tenderness; no ischemic disease in the legs . . . (R. 24).

During the administrative hearing, Plaintiff testified she experienced constant, daily pain in her back and legs; her back and leg pain was at six on a scale of one-to-ten, but elevated twice daily to a level ten; could stand for fifteen to twenty minutes and could walk for five to fifteen minutes at a time, she could sit for approximately thirty minutes at a time, and she had to lie down for two-to-five hours due to back and leg pain. Plaintiff stated, however, she treated her back and leg pain with Neurontin, Ibuprofen, and Darvocet, which helped ease her pain and that she experienced no adverse side effects of that medication (R. 381-83).

The ALJ's RFC accommodated Plaintiff's back and leg pain caused by diabetic neuropathy. He limited her to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs. He eliminated her ability to climb ladders, ropes, and scaffolds. Light work involves walking, standing, and sitting. The ALJ relied on the opinion of the state-agency physician in determining Plaintiff's exertional limitations in those categories. In reaching her opinion that the Plaintiff could perform light work, the state-agency relied on the October 13, 2005, examination of Plaintiff by Dr. Beard, who found a negative straight leg-raising test, possible diabetic neuropathy, bilateral knee pain with evidence of patellofemoral chonromalacia or osteoarthritis, and range of motion within normal limits (except for reduced cervical spine extension to sixty degrees); considered a January 1, 2005, record where Plaintiff stated her medical conditions included "neuropathy, CHF, diabetic, anxiety, depression, hypertension, and deaf" in right ear; and noted Plaintiff's Doppler waveform analysis showed no evidence of resting ischemia in either leg and her lumbar spine MRI showed a small disc protrusion at L5-S1 with no spinal stenosis but mild left neural foraminal encroachment

and no direct compression of the nerve root (R. 218). The undersigned, therefore, finds that the ALJ's decision as to Plaintiff's severe impairment, diabetic neuropathy, is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Summary Judgment be **DENIED**, in part, and **GRANTED**, in part, and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **27** day of *April*, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

25